Filed 8/27/20  In re L.B. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| In re L.B., a Person Coming Under the Juvenile Court Law. | C089294 |
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>L.B.,<br><br>Defendant and Appellant. | (Super. Ct. Nos. JDSQ17-184, JDSQ17-274, JDSQ17-415, JDSQ18-131) |

Minor L.B. was the subject of four sustained wardship petitions under Welfare and Institutions Code section 602[1] after he pleaded no contest to misdemeanor battery, misdemeanor assault, felony vehicle theft, and felony assault with a deadly weapon, which assault he admitted he committed for the benefit of a criminal street gang.

_____

[1] Further undesignated statutory references are to the Welfare and Institutions Code.

1

Numerous other alleged offenses as well as a fifth wardship petition alleging that L.B. shot at an inhabited dwelling were dismissed with consideration.

The court initially placed L.B. on probation in his mother's home. Following several probation violations and sustaining the fourth wardship petition, the juvenile court committed L.B. to the Department of Juvenile Justice (DJJ; now the California Health and Human Services Agency Department of Youth and Community Restoration; see Gov. Code, §§ 12820-12821, Stats. 2019, ch. 25, § 20) after a contested dispositional hearing in which his counsel objected that a group home placement was more appropriate than DJJ.

L.B. contends on appeal that the juvenile court abused its discretion in committing him to DJJ because insufficient evidence showed he would benefit from a DJJ commitment and a less restrictive alternative, a short-term therapeutic residential treatment home, was arguably more appropriate under the circumstances. He also challenges several conditions imposed by the juvenile court at disposition, arguing that the court lacked jurisdiction to impose conditions of probation once it committed him to DJJ and that certain restitution fines could not be imposed without first determining his ability to pay.

After examining the record, we find no abuse of discretion because substantial evidence supports the juvenile court's DJJ commitment decision. We agree certain conditions of probation must be stricken and shall modify the judgment accordingly. As so modified, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. First Wardship Petition (Case No. JDSQ17-184)

In June 2016, L.B. was apprehended wandering around an apartment complex where he did not live at nearly 2:30 a.m. in violation of a Woodland curfew ordinance.

In early April 2017, L.B. and another minor kicked and beat a known Sureño gang member while he was lying on the ground. After a bystander yelled at them to stop, L.B. and his cohort fled the scene.

Approximately a week later, L.B. invited a minor girl to drink and hang out with him and his friends. After a few hours, the girl decided to leave even though L.B. did not want her to go. L.B. punched her numerous times, pushed her down, and took her phone and threw it in a nearby field. While she was on the ground, L.B. and his friend kicked the girl in the face and body several times. As she tried to get up, L.B. stomped her hand. The girl eventually escaped to a nearby business for help. She was later treated at the hospital for several injuries, including a fractured finger and concussion. When police contacted L.B., he claimed he had been at his house at the time.

Based on the above incidents, the Yolo County District Attorney filed a section 602 petition (first wardship petition) on April 25, 2017, alleging that L.B. committed battery with serious bodily injury (Pen. Code, § 243, subd. (d), count 1), assault by means of force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(4), count 2), misdemeanor battery (Pen. Code, § 242, count 3), and misdemeanor curfew violation (Woodland Mun. Code, § 15-24, count 4). L.B. was 14 years old at the time.

The court appointed L.B. counsel and he denied the allegations in the first wardship petition. The court detained him after finding a prima facie case based on the verified petition that L.B. came within section 602.

On April 28, 2017, the court held a jurisdiction hearing in which it also reviewed L.B.'s detention status. At the hearing, the probation officer informed the court that L.B. had received a special incident report (SIR or incident report) while in juvenile hall for being defiant and uncooperative with staff. Defense counsel requested that the court release L.B. on GPS monitoring, claiming his father, who had a terminal illness, could supervise him when he was not in school. The prosecutor argued the court should continue to detain L.B. given the recent incident report, which showed he would not

3

follow the court's orders if released, and that it was unclear whether either of his parents would sufficiently monitor him. The probation officer also noted that L.B. did not have a good relationship with his father, whom L.B. said used methamphetamine.

Following the hearing, the court declined to authorize L.B.'s release, citing his problematic behavior in juvenile hall and concerns over the type of supervision he would receive at home.[2] The court continued the jurisdiction hearing to May 1.

At the continued jurisdiction hearing, the court again expressed concerns about supervision plans for L.B. if released, and also noted that L.B. received another incident report while in juvenile hall for taking prescription medication that was not prescribed to him. Probation also expressed concerns over releasing L.B., citing three rule violations, which probation said was "very unusual for someone their first time in juvenile hall." Defense counsel sought L.B.'s release, explaining that L.B.'s father agreed to take him to and from school to ensure his attendance. While counsel admitted that L.B. had not been attending school regularly, and that there were issues with his father, she believed L.B. was willing to follow the court's orders if released, including attending school and counseling. Again raising supervision and public safety concerns, the court continued L.B. in detention and set a continued jurisdiction hearing for May 3.

At the continued hearing, probation informed the court that L.B. had received two more incident reports in juvenile hall, one for inciting two other minors to fight and the other for not listening in the exercise yard. Probation continued to express concerns about L.B.'s father appropriately supervising him if he were released.[3] Despite its

---

[2] L.B.'s mother worked varying shifts at a retail store. At the time, his father was dying of brain cancer; he passed away in July 2017. In March 2017 his older brother was incarcerated and charged with manslaughter for killing a minor.

[3] During the hearing, the prosecutor noted that during a visit between L.B. and his father, probation overheard a conversation in which L.B. supposedly told his father about a

4

concerns, the court authorized probation to release L.B. on GPS monitoring with various terms and conditions, including obeying all reasonable orders from his father and obeying the law. The court set a contested jurisdictional hearing for May 17.

On May 16 probation filed a notice of GPS revocation, alleging that L.B. had left his residence around midnight on two separate occasions without permission. After being taken into custody, L.B. received another incident report in juvenile hall for squaring off with another minor and he was not receptive to counseling.

On May 17, the court found L.B. had violated the court's order and again made prima facie findings that L.B. came within section 602, placing him in the care and responsibility of the probation department. The court released L.B. with GPS supervision for a second time.

## B.     Second Wardship Petition (Case No. JDSQ17-274)

On May 22, 2017, the Yolo County District Attorney filed a second wardship petition alleging that on May 18, L.B. committed assault by means of force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(1), count 1), conspiracy to commit assault (Pen. Code, § 182, subd. (a)(1), count 2), and misdemeanor resisting or obstructing a peace officer (Pen. Code, § 148, subd. (a)(1), count 3), and that on April 11, L.B. committed assault by means of force likely to produce great bodily injury (count 4) and conspiracy to commit assault (count 5).[4]

According to probation, on May 18, L.B. and another minor advanced on a third minor and repeatedly punched him in the face and body while they were exercising in the

---

stolen iPhone and EBT card in his room, and the father did not alert probation or otherwise turn over the phone.

[4] Count Nos. 4 and 5 of the second wardship petition, which were based on the April 11 attack on the Sureño gang member, were previously charged in the first wardship petition, and were later dismissed by the court on the prosecutor's motion.

juvenile hall recreation yard. He refused officers commands to stop and cover, and continued hitting the victim. An officer deployed pepper spray to stop the attack.

At a jurisdiction hearing on May 25, 2017, defense counsel requested L.B.'s release, arguing he had made some progress with counseling. The district attorney opposed his release, citing safety concerns given his three separate battery incidents over the previous month where he injured other minors. Probation also opposed release, noting that L.B. had received another juvenile hall incident report on May 21 for yelling "Norte" and threatening to physically assault anyone from Mexico.

The court ultimately re-released L.B. on contract (§ 628.1) to his mother's care. The matter was continued to June 8, 2017.

On May 31, 2017, the probation officer filed a section 777 notice to revoke L.B.'s contract release. According to the notice, on May 27, the female assault victim from the first wardship petition and her father were walking down the street when a car pulled next to them and L.B. began flipping her off and aggressively yelling at her; the victim identified L.B.'s mother as the driver of the car. At a hearing on the notice, the court ordered L.B. detained.

At a review hearing on June 7, 2017, the probation officer informed the court that L.B. received an incident report on June 6 while detained in juvenile hall for gang-related drawings found in his room and journal. Probation recommended that L.B. not be rereleased on GPS supervision. Defense counsel argued that he was easily influenced and would be better off being released rather than held in juvenile hall where he was susceptible to gang influences. Following the hearing, the court authorized probation to release L.B. on GPS supervision, and continued the matter to June 15.

At the continued jurisdiction hearing on June 15, L.B. pleaded no contest to misdemeanor battery (count 3) in the first wardship petition, and misdemeanor assault

(count 1 as amended) in the second wardship petition.[5]  The remaining counts in both petitions were dismissed.  The juvenile court calculated L.B.'s maximum term of confinement as one year two months.

Probation filed a disposition report and two amended reports prior to the disposition hearing on July 17, 2017.  The reports, among other things, detailed the circumstances of L.B.'s offenses, his numerous incident reports while in juvenile hall, as well as his home life, failing education, and drug and alcohol abuse.  The second amended report categorized L.B.'s current risk level as "high," with dynamic risks related to his education, employment, peers, social support network, substance abuse, mental health, and personality.

After considering the reports, the juvenile court adjudged L.B. a ward of the court in both wardship petitions and ordered that he remain in the custody of his parents, under supervision of the probation officer.  L.B. was subject to numerous terms and conditions of probation.

## C.    Third Wardship Petition (Case No. JDSQ17-415)

Less than a month later, on August 6, 2017, L.B. and several other cohorts stole a vehicle from a man that one of the cohorts had contacted through social media.  As the victim helped the girl, who pretended to be sick, L.B. tried to drive away in the victim's car; he was unable to operate the gearshift so another girl got behind the wheel and drove away while the owner of the car was dragged for about 30 feet until he finally let go of the car.  L.B. was detained following the incident.

On August 9, 2017, the Yolo County District Attorney filed a third wardship petition against L.B. alleging carjacking (Pen. Code, § 215, subd. (a), count 1), conspiracy to commit carjacking (Pen. Code, § 182, subd. (a)(1), count 2), grand theft

---

[5]  Counsel stipulated that the police reports could serve as the factual basis for the pleas.

auto (Pen. Code, § 487, subd. (d)(1), count 3), unlawful taking or driving a vehicle (Veh. Code, § 10851, subd. (a), count 4), misdemeanor driving without a valid license (Veh. Code, § 12500, subd. (a), count 5), and misdemeanor curfew violation (Yolo County Code, § 5-5.04, count 6).

The district attorney then filed a notice pursuant to section 777 alleging L.B. had violated the terms and conditions of his probation from the first and second wardship petitions, including committing new crimes, violating curfew, and associating with specific prohibited persons. The court ordered L.B. detained,[6] and set a jurisdictional hearing.

On August 24, 2017, L.B. pleaded no contest to felony vehicle theft (count 4 of the third wardship petition);[7] the remaining counts as well as the notice of hearing filed for the first and second wardship petitions were dismissed with consideration. The court calculated L.B.'s maximum confinement time as three years six months.

On August 31, 2017, the court adjudged L.B. a ward of the court for the third wardship petition and continued him a ward of the court in the first two petitions. L.B. was placed in the custody of his mother under the supervision of the probation officer on GPS supervision with various terms and conditions, including participating in community-based services.

At a hearing in November 2017, probation informed the court that L.B. was attending WRAP services and had made some progress, but that he had twice tested positive for marijuana. The court ordered L.B. to continue drug testing, and set a followup hearing in December. Thereafter, L.B.'s behavior began to deteriorate.

---

[6] L.B.'s father had passed away two weeks before.

[7] The parties stipulated that Yolo County Sheriff's Office report No. 17-2081 could serve as the factual basis for the plea.

**D.      Probation Violations in All Three Wardship Cases**

On December 13, 2017, the Yolo County District Attorney filed a section 777 notice of hearing in all three wardship cases, alleging L.B. violated the court's August 31 order by testing positive for marijuana, being suspended, not engaging in WRAP services, and failing to attend his court hearing.  In January 2018, L.B. admitted violating the court's order in all three cases by testing positive for marijuana on October 12, 2017, and the remaining allegations were dismissed with consideration at disposition.

Disposition was set for March 6, 2018.  That day, L.B. was taken into custody and detained for several alleged criminal violations that occurred in February 2018.

**E.      Fourth Wardship Petition (Case No. JDSQ18-131)**

On March 7, 2018, the Yolo County District Attorney filed a fourth wardship petition alleging that in February 2018, L.B. committed attempted murder (Pen. Code, §§ 21a, 664, 187, subd. (a), count 1), shot at an occupied vehicle (Pen. Code, § 246, count 2), and maliciously discharged a firearm from a vehicle at another person (Pen. Code, § 26100, subd. (c), count 3).  He was 15 years old at the time.

According to the detention report,[8] L.B. had taken his mother's car without her permission on February 12, 2018.  L.B. and another male followed a car into a parking lot, and someone in L.B.'s vehicle fired three shots at the car, hitting the other driver in the buttocks.  L.B. initially told authorities that two other males in his car had forced him to pull the trigger.  He then claimed that the two other males had threatened to shoot him if he did not participate and drive fast, and that a man known by the moniker "Bigfoot" was the person who actually fired the gun.  Police later determined from surveillance video that the man identified as Bigfoot was not in L.B.'s car at the time of the shooting.

---

[8] The detention report also referenced another shooting L.B. allegedly was involved in on February 10, 2018; he used his mother's car in a drive-by shooting of a Sureño gang member's home.  That incident was later the subject of a fifth wardship petition.

L.B. denied the allegations of the fourth wardship petition, and the court ordered him detained. The matter was then set for a contested detention hearing. Following the hearing, the court continued L.B. in detention at juvenile hall.

At a subsequent hearing on March 19, 2018, defense counsel requested that probation consider placing L.B. with a relative, and also explore whether institutional placements like a group home were available. The court ordered probation to do both.

**F.    Fifth Wardship Petition (Case No. JDSQ18-178)**

On April 2, 2018, the Yolo County District Attorney filed a fifth wardship petition alleging L.B. shot at an inhabited dwelling (Pen. Code, § 246, count 1) on February 10. L.B. drove by the residence of a validated Sureño gang member in Woodland and a male occupant in his car shot into the residence.

On April 3, 2018, L.B. denied the allegations of the fifth wardship petition, and the court found a prima facie case for detaining L.B. At a subsequent hearing, probation reported that it was having difficulty contacting L.B.'s relatives for potential placement, and also that L.B. continued to be manipulative, disrespectful, and defiant while detained at juvenile hall. On May 10 probation reported that L.B. had received three additional incident reports while detained.

On May 17, 2018, probation reported that after investigating the home of L.B.'s aunt and grandfather in Amador County, it concluded that their home was not a suitable placement for L.B. Officials at Amador County probation also declined to supervise L.B. if he was placed with his relatives.

**G.    Motions to Transfer to Adult Criminal Court**

Based on the gravity of the offenses, the prosecutor filed section 707 motions to transfer the fourth and fifth wardship petitions to adult criminal court.

On July 18, 2018, probation filed a report evaluating the propriety of transferring L.B. to criminal court. The transfer report detailed the circumstances of the offenses, L.B.'s family relationships and upbringing, his Norteño gang ties, his drinking and

substance abuse issues, including regularly using alcohol, marijuana, and cocaine, previous unsuccessful counseling efforts, the impacts on the victims, and the numerous incident reports L.B. had received while in custody at juvenile hall. After considering several factors, including L.B.'s degree of criminal sophistication, his likelihood of rehabilitation before the juvenile court's jurisdiction expired, his previous delinquent history, the many unsuccessful attempts to rehabilitate him, and the gravity of the alleged offenses, probation recommended that L.B. be transferred to adult criminal court.

L.B. opposed the transfer request, arguing that his traumatic upbringing, lack of services, immaturity, and unsophisticated criminal nature warranted keeping him in juvenile court. L.B. also argued that numerous treatment programs available at DJJ would benefit him and would specifically address his history of trauma, mental health issues, substance abuse, and gang ties. These programs included: comprehensive educational programs to assist children with obtaining high school diplomas or completing college coursework and vocational programs; programs to monitor and treat minors with mental health symptoms by licensed professionals, including utilizing a trauma focused cognitive behavioral treatment program to support children with traumatic histories like himself; cognitive behavioral interventions for substance abuse, which was a 38-session curriculum providing intensive cognitive-behavioral restructuring for addicted youth; gang intervention programs; and reentry services to ensure services are set up to support the transition from DJJ back into the community upon release. According to L.B., the "evidence-based programming" at DJJ would be beneficial not only because the "rehabilitative services [would] address his criminogenic risks," but also because "society [would] be safer as his risk of recidivism is lowered."

Dr. Matthew Soulier, an expert in adolescent forensic psychiatry, also prepared a report on L.B.'s behalf. Dr. Soulier opined that L.B. could be rehabilitated before age 23 and should be committed to DJJ "because they have the resources and necessary developmental expertise to rehabilitate him." According to Dr. Soulier, "DJJ would

11

assess his needs and match his risks to their services. DJJ can provide gang intervention services, [individualized education program] support for his special education needs, anger management and trauma counseling, substance abuse services, [attention deficit hyperactivity disorder] treatment, vocational training, and aftercare planning to ensure he ultimately moves to a different environment, gains employment, and works toward independence away from his gang-infested community."

At the transfer hearing, probation officer Ana Gastelum, who prepared the transfer report, testified about her recommendation to transfer L.B. to adult criminal court. During cross-examination, she acknowledged that DJJ applied an integrated behavioral treatment model, which involved conducting numerous evaluations and assessments when a youth was initially committed in order to individually tailor the services provided to the offender to address the issues that brought them to DJJ. These included assessments to address specific mental health treatment, anger management, and gang intervention needs. Gastelum agreed that the youth were then placed in various units at DJJ depending on their level of risk and their level of need for services. She also testified that DJJ conducts reviews every three to six months to reevaluate the services being provided to ensure that the minor's risks and issues are being properly addressed. She also conceded that given the nature of the most recent crimes, L.B. was eligible to be committed to DJJ until he was 25, and, under certain circumstances, beyond the age of 25 if necessary.

Dr. Soulier testified on L.B.'s behalf. In his opinion, L.B.'s crimes were not criminally sophisticated, his delinquent history did not support transfer, inadequate services had thus far been offered to L.B., and although the crimes were grave, the circumstances of the offenses did not warrant transfer. L.B., he believed, could be successfully rehabilitated in the juvenile court system rather than in adult criminal court. According to Dr. Soulier, L.B. needed a psychiatrist to prescribe psychiatric medicine for his attention deficit hyperactivity disorder (ADHD), substance abuse counseling, drug

12

screening with consequences for positive or negative drug screens, an individual trauma counselor, educational planning services, and gang intervention services.

During cross-examination, Dr. Soulier testified that "DJJ could provide adequate services necessary to rehabilitate [L.B.]." On redirect, he explained that he was "mostly answering the question of the [transfer] factors," and whether, in his opinion, L.B. could "be rehabilitated before the expiration of juvenile jurisdiction"; he conceded that "DJJ [was] one of the options that could serve those needs and thus answer that question." When defense counsel asked whether he really meant that DJJ was just one alternative, and that another alternative was a structured group home, Dr. Soulier responded that legally he was not aware that there would be another option for L.B., so he had not necessarily considered it.

The defense also called Lorraine Custino, a parole agent and court liaison with the DJJ. She testified that DJJ provides services to youth based on individualized assessments, and treats identified needs through evidence-based education, treatment and interventions. According to Custino, DJJ utilized the integrated behavior treatment model in which all staff members were trained in the intervention program principles. Staff received yearly training on the offered programs, and are monitored throughout the year to ensure they are implementing the training correctly.

Custino explained that the intake process at DJJ usually takes 45 days. During that time, incoming youth are assessed for educational, mental health, medical and psychiatric needs, and a case plan is developed to address those particular needs. Each individual treatment plan is routinely reviewed every 120 days or as needed to identify what is working for the youth and what might need to be changed to help better address his or her specific issues. Minors are then placed in housing units depending on their risk level for reoffending, with lower risk youth housed together. For those continuing to have aggression and violence issues, DJJ had a behavior treatment program, which helps struggling youth find more prosocial ways to deal with their emotions. DJJ also had an

13

intensive behavior treatment program that deals with youth with mental health issues who are acting out violently. There is also a mental health residential unit for those with mental health issues that have trouble functioning in a larger living unit or regular school; the unit has a smaller population, more contact with a psychologist, and has an attached school. Those who are higher functioning, but still have mental health issues, also have access to mental health treatment in the regular units. All youth receive individual counseling with the youth counselors for at least an hour a week, although they often see them more regularly throughout the week as well. They also receive group interventions depending on their assessed needs.

Case conferences are every 60, 90, or 120 days depending on the youth's assigned unit. During case conference meetings, the youth meet with their education advisor, their correctional youth advisor, their casework specialist or the parole agent, and a psychologist. Parents can also be involved in the conference telephonically, as can probation officers from a youth's home county. At the conference, the participants review the youth's treatment, their group living, their education, and their employability to determine whether goals have been met or their needs should be reassessed. There is also a yearly review for each youth.

DJJ provided youth correctional counselors to each unit; these individuals are in the living units with the youth at all times and provide a parental role, ensuring that youths eat their meals, go to school, and get their treatments. Youth are also provided with casework specialists, who are parole agents with master's degrees in social work. The casework specialists do the initial screenings and handle casework needs.

Custino further testified that DJJ provides a 10-week aggression interruption training program for those youths that have a high risk of violent aggression, which tries to identify the reason for the underlying issues and also helps find ways to deal with their violent emotions in a more prosocial manner. CounterPoint is another program DJJ uses that deals with thought processes and helping youth find more appropriate social ways of

14

dealing with others and negative peer influences. The CounterPoint program is also used to address gang interventions. Custino testified about a new pilot program DJJ was implementing for gang intervention known as the Phoenix Freedom 100 Program. DJJ also provided a 38-week cognitive behavioral intervention program to address substance abuse issues. DJJ also randomly drug tested, and would assign youth to Alcoholics Anonymous and Narcotics Anonymous meetings as well. DJJ's mental health treatment program involved a trauma-focused approach.

Custino testified that DJJ was accredited by the Western Association of Schools and Colleges, and that youth could earn their high school diplomas while committed. DJJ also provided college course opportunities so youth could earn an associate of arts degree, and vocational skills training, including a six-month CALPIA carpentry program, where youth could become preapprentices in labor and carpentry. Upon discharge, they are given their first-year union dues as well as $500 worth of tools in the trade and job assistance. DJJ also offered the Free Venture Program, where youth learned to refurbish computers, as well as a fire camp program, where they could earn a certificate to apply at CAL FIRE. DJJ also provided Microsoft Office certificates as well as landscaping, forklift, and culinary certificates.

According to Custino, DJJ also offered avenues for immediate family involvement during commitment. Depending on the circumstances, family counseling could be part of a youth's case plan. A reentry coordinator would also develop a reentry plan and work with the youth's home probation county to determine available resources upon reentry.

Defense counsel questioned Custino about whether she was familiar with an organization known as CJCJ (the Center on Juvenile and Criminal Justice), which had expressed concerns about DJJ's programs. Custino responded that she was aware CJCJ had an agenda and that many of its concerns were before DJJ had implemented the integrated behavior treatment model. She also noted that while CJCJ claimed that DJJ

15

had a shortage of psychologists and mental health professionals, DJJ was currently fully staffed.

After considering the transfer report, L.B.'s opposition, Dr. Soulier's report, and the testimony at the transfer hearing, the juvenile court denied transfer. In weighing the relevant transfer factors, the court found that although the gravity of the offenses supported transfer, the remaining factors weighed in favor of retaining L.B. in juvenile court.

## H.    Disposition

Following denial of the transfer motions and prior to a contested jurisdictional hearing on the fourth and fifth wardship petitions, L.B. resolved both petitions. The fourth wardship petition was amended to include one count of assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1), count 4) with an attached gang enhancement (Pen. Code, § 186.22, subd. (b)(1)). L.B. agreed to plead no contest to the added assault offense and the gang enhancement in exchange for dismissal with consideration of all remaining counts in the fourth wardship petition, the fifth wardship petition, and all outstanding notices of hearing. At the plea hearing, defense counsel requested that probation look for potential group home placements prior to the disposition hearing so that the court had "all dispositional alternatives available" for consideration.

On January 4, 2019, probation filed a disposition report recommending that L.B. be committed to DJJ because it offered the structure and services L.B. needed to address his long-term needs. The report detailed the programs available at DJJ, which the court had already received extensive information on during the transfer hearing. These programs included: aggression interruption training, which addressed social skill competence, anger control and moral reasoning; CounterPoint, which addressed anti-social attitudes and negative peer influence; trauma focused cognitive behavioral therapy, which addressed emotional and behavior difficulties resulting from traumatic life events; cognitive behavioral intervention for substance abuse, which addressed substance abuse

16

issues; and behavior treatment program interventions, which provided minors with alternative ways of thinking and behaving in order to avoid aggression and violence. DJJ also incorporates a skill of the week, which provides practice for 52 social skills. Probation also found that a short-term residential therapeutic program, which generally lasted six months and required extensive parental involvement upon release, was not appropriate given that L.B.'s treatment and rehabilitation would take longer than six months and his mother had repeatedly failed to be involved in his treatment and care.

Defense counsel filed a sentencing brief arguing L.B. should be placed in a short-term therapeutic group home since he had never been removed from his home and received the full rehabilitative benefit and services of the juvenile justice system. Although defense counsel acknowledged that DJJ provided vastly more rehabilitative services than the adult criminal system (given defense's previous arguments and testimony at the transfer hearing regarding the availability and benefits of DJJ services that could be tailored to L.B.'s specific needs), counsel nevertheless argued that the prosecutor failed to show by a preponderance of the evidence that L.B. would benefit from a DJJ commitment given recent concerns expressed by the Governor about DJJ's effectiveness. Counsel also argued that probation had failed to adequately consider a less restrictive placement than DJJ, and that various group homes offered similar services to DJJ.

L.B. filed a supplemental sentencing brief with an attached report from CJCJ entitled "Unmet Promises: Continued Violence & Neglect in California's Division of Juvenile Justice." Based on the report, counsel argued that the dormitory-like living facilities at DJJ presented safety concerns if L.B. was housed with more violent and older youth.

Relying primarily on Dr. Soulier's previous report and testimony during the transfer hearing, the prosecution filed a sentencing brief arguing that L.B. should be

17

committed to DJJ and that a group home would not be appropriate to address L.B.'s myriad of issues.

At the date set for disposition, the court continued the hearing at defense counsel's request so that L.B. could be interviewed by the group home Courage to Change to determine whether he would be an appropriate candidate. At the continued hearing, defense counsel requested that probation look into several group homes, including Optimist Youth Group Homes and Family Services, Aldea Children and Family Services, Haynes Family Programs, The Boys Republic, Michigan House, Aspiranet, and Mary's Help Group Home. Additionally, defense counsel asked probation to consider placement in out-of-state group homes, including Glen Mills.

The probation officer informed the court that several of the homes were not licensed as short-term therapeutic programs and that Optimist Youth Group Homes and Family Services would not accept persons associated with northern gangs for safety reasons as it was located in southern California. Nevertheless, at the court's request, probation agreed to look into potential short-term residential therapeutic programs as defense counsel requested.

On March 6, 2019, probation submitted a report detailing its investigation into the group homes suggested by defense counsel. Many of the programs were either not properly licensed, did not have gang components, would not interview minors with northern gang ties, or had deemed L.B. inappropriate for placement in its facilities; at least one facility was being investigated for mistreating youth. Because no properly licensed short-term therapeutic group homes had been located that would adequately address L.B.'s long-term rehabilitative needs, probation still recommended that L.B. be committed to DJJ.

On March 7, 2019, defense counsel filed a supplemental sentencing and disposition statement arguing that it would not be in L.B.'s best interest to undergo a 90-day evaluation by DJJ to determine whether less restrictive alternatives at the county

18

level had been appropriately exhausted. In counsel's view, given the extensive proceedings conducted on the motions to transfer to adult criminal court, such a report would be "duplicative of the exhaustive evidence already before the juvenile court," including "services available to the minor at [DJJ]."

At the continued disposition hearing on March 11, 2019, defense counsel called J.N., a minor who was on probation for attempted murder with gang enhancements, to testify about his experience at the group home Courage to Change. He said he received individual counseling, gang intervention, opportunities to receive mentoring and to mentor other youth as well as help with daily life skills, job applications and interviews, and transitional housing upon release. He also did community service while at the home.

Defense counsel argued that a group home placement was more appropriate for L.B. and that he could receive longer-term services in a group home similar to DJJ. Counsel also questioned the probable benefit to L.B. if committed to DJJ given the concerns raised in CJCJ's most recent report about the safety of DJJ for younger minors like L.B. Counsel argued that the court had sufficient information before it to determine whether DJJ was appropriate, and she urged the court to find that L.B. was better suited to a group home environment.

Both the prosecutor and probation argued that L.B. should be committed to DJJ to address his long-term needs and to protect the public, especially given the gravity of his offenses. Following the arguments of counsel and probation, the court continued the disposition hearing so it could review all of the information presented.

At the continued disposition hearing on March 18, 2019, the court committed L.B. to DJJ, selecting a maximum term of confinement of eight years 68 days with 433 days of confinement credit. The court noted L.B.'s history of significant trauma from having neglectful parents, physical abuse, a father on drugs who had recently died, an uninvolved mother who repeatedly failed to engage in services, and a brother with

criminal gang ties. L.B.'s home was at times uninhabitable and he often had no food. L.B. also had a substance abuse problem and untreated mental health issues for ADHD.

The court was further concerned that L.B. had not expressed any meaningful insight or remorse for his crimes, and the effect those crimes had on the victims and the community. The court further found that L.B. was reluctant to address or discuss his traumatic upbringing, did not think he needed gang intervention or substance abuse counseling, and had on occasion refused to take his ADHD medication.

The court found that a short-term residential treatment program was not appropriate because it was not designed to address long-term rehabilitation needs such as L.B.'s; in general, the programs were only intended to last from six months to a year, and L.B.'s rehabilitation needs extended beyond that relatively short time period. Furthermore, the short-term programs envisioned significant parental involvement during and following release, and L.B. did not have the family support needed to succeed in and after such a program. The court found that placing L.B. in a short-term residential treatment program would put his safety, and the safety of the community, at risk. All of the short-term facilities probation had contacted were found not to be appropriate, either because they lacked the required licensing, did not offer services L.B.'s treatment required, or had declined to accept L.B. given his gang affiliation or his negative interactions with minors already placed at those locations.

The court found that DJJ, by contrast, did have the structure, programs, and treatment services L.B. needed. Based on the extensive evidence offered at the transfer hearing by Dr. Soulier, L.B.'s own expert forensic child psychiatrist, and DJJ employee Custino, the court found that the evidence-based programs at DJJ could be specifically tailored to meet L.B.'s needs, and that he would be reevaluated on a regular basis to ensure that the treatment programs were addressing his precise issues, including gang intervention services, individualized education program (IEP) support for special education needs, anger management, trauma counseling, substance abuse services,

20

ADHD treatment, vocational training, and the reentry plans to ensure that L.B. moved to a more healthy environment upon release.

Although the court acknowledged the CJCJ report criticizing DJJ, it did not find the evidence compelling. After considering the totality of the evidence before it, the court found that DJJ was the appropriate place to rehabilitate L.B., and that he would benefit from the services provided there. L.B. timely appealed the court's commitment order.

## DISCUSSION

### I

### *DJJ Commitment*

Juvenile delinquency statutes are "designed to give the court 'maximum flexibility to craft suitable orders aimed at rehabilitating the particular ward before it.' " (*In re Greg F.* (2012) 55 Cal.4th 393, 411; *In re George M.* (1993) 14 Cal.App.4th 376, 379.) Thus, a juvenile court has broad discretion in determining the appropriate rehabilitative and punitive measures for juvenile offenders. (§ 202 [juvenile court must commit delinquent minors "in conformity with the interests of public safety and protection, [to] receive care, treatment, and guidance that is consistent with their best interest, that holds them accountable for their behavior, and that is appropriate for their circumstances"].)

The statutory scheme "contemplates a progressively more restrictive and punitive series of dispositions starting with home placement under supervision, and progressing to foster home placement, placement in a local treatment facility, and finally placement at the DJJ." (*In re M.S.* (2009) 174 Cal.App.4th 1241, 1250.) "Although the DJJ is normally a placement of last resort, there is no absolute rule that a DJJ commitment cannot be ordered unless less restrictive placements have been attempted." (*Ibid.*)

We review a commitment decision for abuse of discretion, indulging all reasonable inferences to support the juvenile court's judgment. (*In re Angela M.* (2003) 111 Cal.App.4th 1392, 1396.) We review the court's findings for substantial evidence.

(*In re Nicole H.* (2016) 244 Cal.App.4th 1150, 1154 [substantial evidence must support juvenile court's factual findings in support of placement decision].) In determining whether substantial evidence supports a juvenile court's commitment order, we examine the record presented at the disposition hearing in light of the purposes of the juvenile court law. (*Ibid.*) "We have no power to judge the effect or value of the evidence, to weigh the evidence, to consider the credibility of witnesses or to resolve conflicts in the evidence or the reasonable inferences which may be drawn from that evidence." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52-53.)

A juvenile court does not abuse its discretion by committing a minor to DJJ where the evidence demonstrates a probable benefit to the minor from the commitment and less restrictive alternatives would be ineffective or inappropriate. (*In re Angela M., supra*, 111 Cal.App.4th at p. 1396; § 734 [prohibiting DJJ commitment "unless the judge of the court is fully satisfied that the mental and physical condition and qualifications of the ward are such as to render it probable that he will be benefited by the reformatory educational discipline or other treatment provided" by DJJ].) When evaluating a juvenile court's exercise of discretion to commit a minor to DJJ, we are mindful of not only rehabilitation and punishment, but also public safety and protection. (*In re Luisa Z.* (2000) 78 Cal.App.4th 978, 987; see also *In re Jonathan T.* (2008) 166 Cal.App.4th 474, 486 ["it is not merely the programs at DJJ which provide a benefit to [the] minor, but the secure setting as well"].)

The juvenile court in this case did not abuse its discretion in determining that committing L.B. to DJJ was appropriate because substantial evidence (much of which L.B. produced himself in arguing against transferring the matter to adult criminal court) shows he would probably benefit from the structure and treatment services available at DJJ. The record amply supports the trial court's findings that L.B. had suffered significant trauma growing up from his abusive and neglectful parents, and had mental health, substance abuse, educational, and gang-related issues that required long-term

22

rehabilitation and treatment programs like those offered by DJJ. Based on the evidence presented, the court reasonably concluded that DJJ, rather than a short-term therapeutic program, would be more effective in meeting his needs and protecting the public.

L.B. lived in an abusive, filthy home with little or no supervision and had suffered significant trauma in his chaotic upbringing. He had been introduced to criminal endeavors and gang activity from his gang member brother from a young age. Neither he nor his mother ever truly engaged in WRAP services, the highest level of services offered in the community. L.B. continued to deny having a substance abuse problem, and denied needing substance abuse treatment even though he readily admitted to using marijuana and cocaine; he admitted he began using marijuana as early as the second grade. He also denied needing gang intervention even though he pleaded no contest to a gang enhancement. When released from custody, L.B. failed to follow the court's probation orders and quickly engaged in increasingly dangerous behavior that gravely endangered the public.

Based on these circumstances, probation found that a less restrictive commitment than DJJ would not be sufficient to address the level of trauma and numerous underlying issues for which L.B. need treatment. The opinion and analysis of Dr. Soulier, a defense expert L.B. hired for the transfer hearing, supports probation's assessment of L.B. and his extensive treatment needs.

Dr. Soulier highlighted several activities and benefits available to L.B. if committed to DJJ. His needs regarding psychiatric medication, education, employment, family, community support and stability, and gang influences would be assessed, and his trauma, violence, aggression, substance abuse, and gang issues would be considered. That Dr. Soulier did not consider a lower level of placement does not mean that the court could not rely on his assessment of L.B.'s needs and DJJ's programs in finding that DJJ was the proper placement for L.B. given the totality of the circumstances.

Similarly, DJJ employee Custino, who L.B. also called to testify on his behalf at the transfer hearing, testified extensively about the available treatment and educational programs at DJJ, how incoming offenders were initially assessed and evaluated, and how specific, individualized treatment programs were crafted with licensed professionals for each minor. She also testified that treatment plans were regularly reviewed and reevaluated to ensure that youth were receiving appropriate treatment. Custino further testified about the manner in which family members could be involved in a minor offender's rehabilitation, and how DJJ plans for and works with the minor's home county to develop a reentry plan upon release.

After considering all the evidence, including the evidence presented at the transfer hearing, the juvenile court was well aware of DJJ's programs and L.B.'s need for a structured treatment environment that addressed not only his traumatic upbringing, but also his long-term needs for psychiatric, special educational, trauma, and substance abuse treatment as well as gang intervention. Given L.B.'s rapid escalation in criminal behaviors while released from custody that significantly endangered others, and in light of Dr. Soulier's expert opinion that DJJ had the programs necessary to address his many complex treatment issues, and Custino's detailed testimony describing the structure and programs offered by DJJ, the court could reasonably conclude that DJJ was a more appropriate placement for L.B., both in terms of his own therapy and the protection of the public. (*In re Angela M., supra*, 111 Cal.App.4th at p. 1397 [juvenile court did not abuse its discretion in committing a minor to the California Youth Authority where evidence showed she had failed on probation at the local level in open placements, had continued to reoffend, and the California Youth Authority had intensive programs to address drug addiction, gang involvement, and mental health issues].)

None of L.B.'s arguments to the contrary are compelling. He argues that the juvenile court's finding regarding gang intervention services available at DJJ is not supported by the evidence. According to L.B., Custino merely testified that DJJ was

24

implementing a new pilot program for gang intervention. But as the People note, Custino testified that DJJ had a current program addressing underlying issues that lead to gang involvement as well as aggression interruption training for minors that are at high risk for acts of violent aggression. While she discussed a new pilot program for gang intervention, she did not testify that DJJ's other programs would be suspended or otherwise end during the pilot period.

L.B. next argues the evidence was insufficient to support the court's finding that DJJ would provide trauma counseling, ADHD treatment, and IEP support for L.B.'s special education needs. He complains that although Custino testified he would be initially screened within 24 hours to determine any medication needs, and that ADHD medication would be continued, she did not testify how frequently L.B. would see a psychiatrist or if it would be on an ongoing basis. He further complains that Custino did not indicate the precise training and experience of DJJ youth counselors with childhood trauma. In a related argument, L.B. claims that Custino did not sufficiently identify how often Narcotics Anonymous or Alcoholics Anonymous meetings were held.

L.B. cites no authority to support the proposition that a court may only commit a youth to DJJ if an entire treatment plan, including the number and length of meetings with specific treating physicians or counselors, is determined before a minor is even placed at DJJ. Nor has he pointed to anything that requires disclosure of each specific youth counselor's training and experience before a minor may be committed to DJJ. We decline to impose such unduly burdensome restrictions on juvenile courts.

Custino testified that youth are evaluated by psychologists with Ph.D.'s using multiple diagnostic evaluations to assess specific mental health issues. She also said although youth are scheduled to meet with their youth counselors once a week, they routinely see them more as youth counselors fulfill a parental role within the living unit and ensure that the youth are getting their necessary treatments. Custino further testified that DJJ takes a trauma-focused approach with minors, and that if a minor has a particular

25

trauma requiring a specific type of counseling in a particular area, it would be provided. Substantial evidence thus supports the court's finding that appropriate trauma-based programs and counseling were available at DJJ to meet L.B.'s needs.

We reject L.B.'s contention that DJJ only provided behavioral treatment programs for those minors it deemed required such treatment thereby undermining the court's finding that sufficient behavioral treatment was available for L.B. at DJJ. In making its finding, the court could reasonably rely on Custino's testimony explaining that the core program included behavioral treatment, and that if a particular minor needed more intensive treatment, additional anger management programs were available.

His argument that Custino did not sufficiently describe the cognitive behavioral intervention program is likewise unavailing. Custino described the types of programs available at DJJ at length. She explained DJJ's treatment model as follows: "[DJJ] provide[s] services based on the individual and . . . [it] decide[s] what those needs are based on our assessments and . . . treat[s] those needs through education, treatment, and interventions." Under the integrated behavior treatment model used by DJJ, all staff, from janitors to youth counselors, receive the same treatment training and are monitored throughout the year to ensure they are properly implementing the training. According to her, "[e]veryone is trained so that all staff at the youth [*sic*] they come in contact with are all trained in our program intervention and everyone is speaking the same [integrated behavior treatment model] language."

While L.B. relies on the CJCJ report to show DJJ had various issues with its programs and housing which rendered it unsafe for young, unsophisticated minor offenders, the juvenile court did not find such evidence compelling. We have no power on appeal to reweigh or resolve conflicts in the evidence. (*In re Casey D., supra*, 70 Cal.App.4th at pp. 52-53.) And, in any event, the fact that the CJCJ report may contradict the opinions and testimony of Dr. Soulier and Custino regarding DJJ's available programs does not mean insufficient evidence supports the juvenile court's

findings or that the court abused its discretion in committing L.B. to DJJ. In reviewing the court's ruling, we resolve all conflicts in favor of the juvenile court's findings. (*In re George T.* (2004) 33 Cal.4th 620, 631 [under substantial evidence standard of review, reversal is not warranted if the circumstances reasonably justify the trier of fact's finding even if the circumstances might also be reasonably reconciled with a contrary finding]; *In re N.C.* (2019) 39 Cal.App.5th 81, 87-88 [conflict in evidence or disagreement among experts does not render juvenile court's commitment order abuse of discretion or warrant reversal; appellate court does not reweigh evidence].)

We find *In re Carlos J.* (2018) 22 Cal.App.5th 1, upon which L.B. relies, inapposite. Unlike in *In re Carlos J.*, where the record contained no evidence of DJJ programs available to benefit the minor, (*id.* at pp. 10-12) here the record is replete with evidence of identified programs and treatment options at DJJ that would benefit L.B. by addressing his specific mental health, educational, trauma, substance abuse, and gang needs. As previously noted, Custino testified at length about DJJ's intake and evaluation process used to determine the specific treatment needs of youthful offenders, and she described in detail the various evidence-based programs available to address the behavior modification, substance abuse, trauma, education, psychiatric, gang, and counseling needs of L.B. No similar evidence was presented in *In re Carlos J.* (*Id.* at pp. 10-12.)

We also reject L.B.'s argument that the juvenile court abused its discretion in finding that a less restrictive alternative such as a short-term residential therapeutic program would not be effective in meeting his needs. Based on the evidence before the court, it could reasonably conclude that L.B.'s complex trauma, educational, psychiatric, substance abuse, and gang-related issues required long-term treatment that would not sufficiently be addressed in a short-term therapeutic program. And given the evidence of his dismal home life and lack of parental participation and oversight, the court could also reasonably conclude that L.B. lacked the family support necessary to succeed in and after a short-term residential therapeutic program.

27

L.B.'s contention that probation conducted a "cursory" investigation of short-term therapeutic programs, which was insufficient to support the court's finding, is without merit. At defense counsel's request, the court ordered probation to consider potential short-term therapeutic group home placements so that the court would have all available information before making its commitment decision. Probation did so. The fact that probation considered those homes recommended by the defense does not mean the investigation of nine different group homes was "cursory." Probation was not required to rule out every possible group home in the state before it could recommend committing L.B. to DJJ. (*In re Oscar A.* (2013) 217 Cal.App.4th 750, 757 [noting the mere existence of other in-state facilities did not mean the court abused its discretion by ordering out-of-state placement].)

Notably, all of the nine homes considered were either unwilling to take L.B. given his gang ties or his conflicts with other minors already placed there, or they were not properly licensed as a short-term residential therapeutic program, did not have gang intervention services, or were under investigation for mistreating minors. Given the results of its inquiry, it is not surprising probation continued to recommend committing L.B. to DJJ.

The court, moreover, found that a short-term residential therapeutic program, even if one had been available, was not adequate to meet L.B.'s individual needs. The general purpose of such programs, as the court noted, was to rehabilitate minors within six months to a year. (§§ 16501.1, subd. (d) [case plan to place youth in short-term residential treatment program must be reviewed semi-annually], 16010.8 [expressing intent of Legislature that youth not be placed in group homes longer than one year].) Because the record supports the juvenile court's finding that L.B.'s issues required longer rehabilitation with in-depth services tailored to his specific needs, the court reasonably concluded a short-term program was inadequate.

While juvenile law does generally contemplate a progressively more restrictive placement scheme (*In re M.S., supra*, 174 Cal.App.4th at p. 1250), "there is no absolute rule that a DJJ commitment cannot be ordered unless less restrictive placements have been attempted." (*Ibid.*) Given the totality of the circumstances and the evidence before it, the juvenile court reasonably found that DJJ was better suited to meet L.B.'s needs even though L.B. had not first been placed in a group home.

## II

### *Probation Conditions*

L.B. contends the juvenile court erred in imposing conditions of probation because it lost the authority to do so once it committed him to DJJ. He argues condition Nos. 6, 12, 13, 16, 16a, 16d, 17a-17e, 18, 19, 20, 21, 37, 39, and Nos. 1 through 8 of the "Probation/Wardship Conditions for Gang Identified Minors" must be stricken.[9] The People agree in part. While they concede the court had no authority to impose general conditions of probation after committing L.B. to DJJ, the People contend the court had authority to order victim restitution and restitution fines, and had authority to order that all prior orders not inconsistent with the court's present order remain in effect.

Committing a minor to DJJ deprives the juvenile court of authority to directly supervise the minor's rehabilitation. (*In re Travis J.* (2013) 222 Cal.App.4th 187, 202.) Thus, following a commitment to DJJ, the juvenile court lacks authority to impose conditions of probation. (*In re Edward C.* (2014) 223 Cal.App.4th 813, 829; *In re Allen N.*, supra, 84 Cal.App.4th at p. 516 ["the imposition of probationary conditions constitutes an impermissible attempt by the juvenile court to be a secondary body governing the minor's rehabilitation"].) Here, the court had no authority to impose

---

[9] L.B. originally challenged condition Nos. 11a through 11e regarding direct victim restitution, but later conceded in his reply brief that the juvenile court had authority to impose direct victim restitution. (*In re Allen N.* (2000) 84 Cal.App.4th 513, 515, fn. 2.)

condition Nos. 6 [advise probation officer of residence and changes to residence], 16 [no association order], 16a [no association order], 16d [no association order], 17a-17e [no contact orders], 18 [warrantless search condition], 19 [barring weapon possession], 20 [barring alcohol or drug possession], 21 [drug or alcohol testing], 37 [gang-related conditions], and condition Nos. 1 through 8 of the Probation/Wardship Conditions for Gang Identified Minors.  We shall order those conditions stricken accordingly.

To the extent L.B. argues the court could not impose the previously ordered restitution fines in condition No. 12 [$50 restitution fine] and No. 13 [$100 restitution fine] because it failed to determine his ability to pay in violation of section 730.5 and due process, his contention is forfeited because *People v. Dueñas* (2019) 30 Cal.App.5th 1157 was decided before the juvenile court in this case imposed the challenged fines and the minor did not assert his inability to pay the fines in the juvenile court.

## DISPOSITION

The juvenile court order committing L.B. to the Department of Juvenile Justice is modified to strike probation condition Nos. 6, 16, 16a, 16d, 17a through 17e, 18, 19, 20, 21, 37, and condition Nos. 1 through 8 of the Probation/Wardship Conditions for Gang Identified Minors.  As so modified, the order is affirmed.


/s/
RAYE, P. J.


We concur:


/s/
ROBIE, J.


/s/
MAURO, J.


30